# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

**BRITTNEY SIMMONS**

    **Plaintiff,**

**v.**

                          **Case No.: 7:18-cv-1973-CLM**

**ANDREW SAUL, Commissioner
of Social Security,**

    **Defendant.**

## MEMORANDUM OPINION

The Social Security Administration ("SSA") denied Brittney Simmons' claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Simmons raises three challenges to that decision; two of which ask the court to reweigh the evidence she presented below—a task that, for all practical purposes, the court cannot do.

But Simmons' remaining challenge spawned one concession of error and two rounds of oral argument. Specifically, the Commissioner concedes that the ALJ who wrote the opinion erred when she failed to consider a statement made by Simmons' treating physician. But that concession didn't end the case; it added two questions:

1. Does the Eleventh Circuit permit district courts to conduct a harmless-error analysis when considering an ALJ's failure to consider a treating physician's opinion?

2. If so, was the ALJ's error harmless?

1

Having considered two rounds of briefing and oral argument, the court answers "yes" to both questions: Yes, harmless error applies; and, yes, the ALJ's error was harmless. Accordingly, the court affirms the decision below.

## I. Statement of the Case

### A. Simmons' Disability, as told to the ALJ

Brittney Simmons was 32 years old when she stopped working as an inventory clerk. Prior to that, Simmons had worked as an administrative assistant, an order filler, a group-home worker, and a shipping-and-receiving clerk.

In her last job as an inventory clerk, Simmons testified below that she lifted rolls of fabric up to 100 pounds, used a ladder to put them in bins, then logged them into a computer (R. 8). She testified that she could no longer work due to "canal stenosis of the spine," with compressions at L2-3, L4-5, and L5-S1 (R. 9). She also testified that "sciatic runs down my left leg" (*id*).

Simmons testified that these issues cause her pain 24 hours a day, and that pain felt "like a knife that went in the top of your buttocks and the rest of your leg" (R. 12). Simmons further testified that she felt a numbness in her left leg that went "all the way to [her] toes" (*id.*). She testified that she could walk for five minutes; stand for five to ten minutes; and sit for about five to ten minutes (R. 13). She testified that her primary doctor, Robert Snyder, told her that she should not lift more than five to ten pounds at a time (*id.*).

As for day-to-day life, Simmons testified that she could not run personal errands like grocery shopping or going to the bank (R. 13). Simmons testified that she could not sweep, mop, vacuum, wash dishes, or make her bed (R. 15). She testified that she could not take a bath or dress herself without help (R. 14-15), and that she could only climb three or four steps at a time (R. 14).

Simmons testified that her primary doctor, Dr. Snyder, referred her to an orthopedic doctor, Dr. Sudduth, who, in turn, referred her to a surgeon, Dr. Faulkner, whose services she could not afford (R. 10).

### B. Determining Disability

The SSA has created the following five-step process to determine whether an individual is disabled and thus entitled to benefits under the Social Security Act:

| The 5-Step Test | | |
|---|---|---|
| Step 1 | Is the Claimant engaged in substantial gainful activity? | If yes, claim denied. If no, proceed to Step 2. |
| Step 2 | Does the Claimant suffer from a severe, medically-determinable impairment or combination of impairments? | If no, claim denied. If yes, proceed to Step 3. |
| Step 3 | Does the Step 2 impairment meet the criteria listed in 20 C.F.R. Pt. 404, Subpt. P, Appx. 1? | If yes, claim granted. If no, proceed to Step 4. |
| *Determine Residual Functional Capacity* | | |
| Step 4 | Does the Claimant possess the residual functional capacity to perform her past relevant work? | If yes, claim denied. If no, proceed to Step 5. |

| Step 5 | Is the Claimant able to do any other work considering her residual functional capacity, age, education, and work experience? | If yes, claim denied. If no, claim granted. |

*See* 20 C.F.R. §§ 404.1520(a), 404.1520(b) (2019) (Step 1); 20 C.F.R. § 404.1520(c) (2019) (Step 2); 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526 (2019) (Step 3); 20 C.F.R. § 404.1520(e-f) (2019) (Step 4); 20 C.F.R. § 404.1520(g) (2019) (Step 5).

As demonstrated by the gray-shaded box, there is an intermediate step between Steps 3 and 4 that requires the ALJ to determine a claimant's "residual functional capacity," which is the claimant's ability to perform physical and mental work activities on a sustained basis. The intermediate step of determining Simmons' residual functional capacity is the most important step in this case, as all of Simmons' challenges flow from the ALJ's decision at this juncture.

### C. Simmons' Application and the ALJ's Decision

The SSA reviews applications for disability benefits in three stages: (1) Initial determination, including reconsideration, (2) review by an ALJ, and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1-4) (2019).

Simmons applied for DIB and SSI benefits in February 2016, claiming that she became unable to work in May 2014 due to a variety of ailments, including hypertension, sciatica, knee pain, lower back problems, and spinal stenosis. The SSA initially denied her claim in September 2016.

Simmons then requested a hearing with an ALJ, which she received in May 2018. Two months later, the ALJ issued an opinion denying Simmons' application (R. at 10-18).

At Step 1, the ALJ determined that Simmons was not engaged in substantial gainful activity, and thus her claim would progress to Step 2 (R. at 12).

At Step 2, the ALJ determined that Simmons suffered from the following severe impairments: spinal stenosis, sciatica, obesity, degenerative arthritis of the knees, and hypertenstion (*id.*). Accordingly, the ALJ proceeded to Step 3.

At Step 3, the ALJ found that none of Simmons' impairments, individually or combined, met or equaled the severity of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (R. 15). Accordingly, the ALJ next had to determine Simmons' residual functional capacity.

The ALJ determined that Simmons had the residual functional capacity "to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)," with multiple exceptions:

- Simmons was limited to carrying 20 pounds occasionally and 10 pounds frequently;

- Simmons could push and pull the same amounts of weight;

- Simmons was limited to sitting, walking, and standing for 6 hours;

- Simmons could occasionally stoop, kneel, crouch, and crawl;

- Simmons could climb ramps and stairs occasionally but never ladders, ropes, or scaffolds; and,

- Simmons could never work at unprotected heights or around moving mechanical parts.

(R. 15-17).

At Step 4, the ALJ determined that Simmons was capable of performing her past work as an administrative assistant, order filler, and/or group-home worker because none of these jobs "require the performance of work-related activities precluded by [Simmons'] residual functional capacity" (R. 17). Based on this finding, the ALJ determined that Simmons was not disabled for the relevant time period (R. 18), and thus did not need to proceed to Step 5. The Appeals Council denied Simmons' request for review of the ALJ's decision (R. 1-3), making the ALJ's opinion the decision of the Commissioner.

### D. The Present Case / Standard of Review

Simmons filed the present action under 42 U.S.C. § 405(g), which limits this court to determining whether (a) the ALJ made a legal error or (b) the ALJ's factual determinations are supported by "substantial evidence." *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). The bar for "substantial evidence" is low; it is merely "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Perales*, 402 U.S. at 401.

**Analysis**

Simmons raises three sections of argument in her brief (doc. 10), and the court addresses them in the order presented.

## I. The ALJ's failure to consider the statement made by Dr. Snyder in Simmons' food stamp application was harmless error.

Simmons' first argument revolves around two nearly identical statements regarding Simmons' ailments; one made by Simmons' doctor, the other by a nurse who worked with that doctor. The ALJ considered the nurse's statement, but not the doctor's. The question is whether that is reversable or harmless error.

<u>Background</u>: While this case progressed below, Simmons applied for food stamps (R. 224). Contained within Simmons' food stamp application is the following hand-written statement by Dr. Robert Snyder, Simmons' primary physician:

> [Simmons] has degenerative joints in bilateral knees, along with bulging discs and stenosis of her L-spine. She was first seen by us on 05/16/16. She is unable to lift, sit, or stand for any period of time without being in pain.

(R. 224). Above this hand-written statement, Dr. Snyder checked the "NO" box when asked whether he believed that Simmons was able to do work (*id.*), and below the statement, Dr. Snyder checked the "YES" box when asked if he thought Simmons' condition was permanent (*id.*).

Regulations require the Commissioner to evaluate every medical opinion he receives and to give reasons for assigning a particular weight to opinions received

from "treating" sources. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c) (2019). The ALJ accepted Simmons' food stamp application into evidence during the hearing (R. 36, Exhibit 15E), meaning that the ALJ had Dr. Snyder's statement. Simmons argues that the ALJ violated the regulations cited above by failing to mention and/or give weight to this statement in her opinion (doc. 10 at 7-14).

The Commissioner concedes that this was error[1] but argues that the failure to mention Dr. Snyder's statement and assess its weight was harmless, thanks to the ALJ's consideration of a nearly identical statement made by his nurse. But, before the court addresses the nurse's statement, it must first determine whether it can even conduct a harmless-error analysis—an issue that is less clear than one might expect.

### A. The court can conduct harmless-error analysis.

This court is bound to follow only the *published* opinions of the Eleventh Circuit, *see* Eleventh Circuit Rule 36-2 ("Unpublished opinions are not considered binding precedent"), and each side cites published circuit precedent that seems to support opposing positions.

---

[1] The court agrees with the Commissioner that the ALJ did not err by not considering or giving weight to the fact that Dr. Snyder checked "YES" on the box that asked whether Simmons was physically unable to work. The ultimate issue of whether Simmons' impairments prevent her from sustaining gainful employment is reserved for the Commissioner. *See* 20 C.F.R. §§ 404.1527(d); 416.927(d). Dr. Snyder's hand-written statement regarding Simmons' physical condition, however, does not invade the province of the Commissioner, and the ALJ erred by not considering that statement.

The Commissioner points to *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) for the proposition that "the Eleventh Circuit has applied the harmless error doctrine to Social Security cases" (doc. 28 at 4). Simmons concedes this point: "Sometimes the Eleventh Circuit says ALJs don't have to discuss everything; or that an ALJ's error in failing to discuss something, or mischaracterizing it, is harmless" (doc. 30 at 2) (citing *Diorio*).

But, as Simmons points out, the Eleventh Circuit has not published an opinion that applies harmless-error analysis to an ALJ's failure to consider a treating source's opinion. Rather, the court's published opinions regarding the failure to mention a treating source's opinion have simply reversed and remanded the case, without mentioning—much less applying—the harmless-error standard. *See Winschel v. Commissioner*, 631 F.3d 1176 (11th Cir. 2011); *Wiggins v. Schweiker*, 679 F.2d 1387 (11th Cir. 1982). Based on these opinions, Simmons argues that reversal is mandated any time an ALJ fails to mention or weigh a treating source's opinion, despite Simmons' concession that the Eleventh Circuit has applied harmless-error analysis to other errors made by ALJs in Social Security cases.

The court does not read *Winschel* and *Wiggins* to create a bright-line rule for errors involving treating-source opinions for three reasons.

1. The federal harmless-error statute mandates that, when pronouncing judgment "on appeal . . . in any case," courts of appeal shall disregard any "errors or

defects which do not affect the substantial right of the parties." 28 U.S.C. § 2111. The Supreme Court has read § 2111 "as expressing a congressional preference for determining 'harmless error' without the use of presumptions insofar as those presumptions may lead courts to find an error harmful, when, in fact, in the particular case before the court, it is not." *Shineski v. Sanders*, 556 U.S. 396, 407-08 (2009).[2]

Because § 2111 is mandatory, and the Supreme Court has stated that it should be applied without presumptions that lead to reversal where no harm exists, *id.*, this court will not presume that the Eleventh Circuit has created a bright-line rule that the failure to mention a treating source's opinion can never be deemed harmless. Instead, the court presumes that the Eleventh Circuit looks for harm, or the lack thereof, "in the particular case before the court." *Shineski*, 556 U.S. at 396.

2. Consistent with this presumption, the Eleventh Circuit did not state in *Winschel* or *Wiggins* that harmless error can *never* apply to the failure to consider a treating source opinion. It just didn't apply harmless-error analysis in those cases.

The circuit court reversed in *Winschel* because it could not tell whether or not the ALJ rejected the medical opinions for valid, supportable reasons. *See Winschel*, 631 F.3d at 1179 ("It is possible that the ALJ considered and rejected these two

---

[2] *Shineski* involved application of harmless-error analysis to a denial of veterans benefits. The Eleventh Circuit recently cited §2111 and *Shineski* in an unpublished opinion to affirm that harmless error applies in Social Security appeals. *See, e.g., Zoslow v. Commissioner*, 778 Fed. Appx. 762, 764 (11th Cir. July 9, 2019).

medical opinions, but without clearly articulated grounds for such a rejection, we cannot determine whether the ALJ's conclusions were rational and supported by substantial evidence. Accordingly, we reverse."). The same can be said in *Wiggins*. *See Wiggins*, 679 F.2d at 1390 ("At the very least, we are unable to determine whether the ALJ applied the proper legal standard and gave the treating physician's evidence substantial or considerable weight or found good cause not to do so.").

Neither *Winschel* nor *Wiggins* forecloses the possibility that, in some case, the ALJ's failure to mention and/or weigh a treating source's opinion may be harmless; a fact seemingly proved by the Court's subsequent *unpublished* opinions.

3. Again, this court cannot rely on unpublished opinions to overcome binding, published precedent. But in a situation like this, in which published opinions seem to pull in two different directions, the court can cite unpublished opinions as persuasive authority to support one position over the other. *See* Eleventh Circuit Rule 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

Since the Eleventh Circuit published *Winschel* in 2011, it has released multiple unpublished opinions that apply harmless-error analysis to the failure to mention or weigh a treating source's opinion. *See, e.g., Raymond v. Commissioner*, 778 Fed. Appx. 766, 775 (11th Cir. July 9, 2019) (stating that any error in failing to assign weight to a treating physician's opinion was harmless because that opinion

did not conflict with other opinions considered by the ALJ); *Romero v. Commissioner*, 752 Fed. Appx. 906, 908 (holding that the failure to give a particular weight to a treating physician's statement was harmless because it was consistent with the ALJ's determination that the claimant could do light work); *Tillman v. Commissioner*, 559 Fed. Appx. 975, 975-76 (11th Cir. April 4, 2014) (holding that the failure to specifically refer to two medical opinions was harmless because it "did not affect the result in Tillman's case").

The court finds one unpublished opinion to be particularly on point: *Chapman v. Commissioner*, 709 Fed. Appx. 992 (11th Cir. Sept. 26, 2017). When Chapman was called for jury duty, her treating physician wrote a letter that listed her ailments, then stated that Chapman was "permanently disabled and was thus not able to serve on a jury." *Id.* at 994. The ALJ failed to consider the jury-duty letter when denying Chapman's claim for disability benefits, *id.* at 995, which the Eleventh Circuit found to violate the same regulations cited by Simmons here. Yet, the Eleventh Circuit deemed this error to be harmless because the opinion contained in the physician's letter was not supported by medical records that the ALJ had considered when denying benefits. *Id.* "Therefore, even if the ALJ erred by not explaining his reasons for discounting [the jury duty] letter, the error was harmless." *Id*.

*Chapman* provides persuasive authority for the Commissioner's argument that the ALJ's failure to consider Dr. Snyder's statement in Simmons' food stamp

application can be deemed harmless, if other evidence that the ALJ did consider in her opinion establishes good cause for discounting Dr. Snyder's opinion.

As shown below, the ALJ not only considered evidence that establishes good cause to discount Dr. Snyder's statement, the ALJ applied that evidence to discount the same statement, almost word-for-word, made by Dr. Snyder's assistant.

**B. The ALJ's error was harmless because she considered and assigned weight to a virtually identical opinion from the same office.**

It is hard to imagine a case in which it is easier to divine the weight an ALJ would have given a treating source's opinion had she considered it. While the ALJ missed Simmons' food-stamp application, she did consider all of the medical records submitted by Dr. Snyder's practice, Cahaba Family Medicine (R. 13-18, *citing* Exhibits 9F-12F). On the cover page of one of those records is a statement by Dr. Snyder's physician's assistant ("PA"), Courtney Smith, that is remarkably similar to the statement Dr. Snyder subsequently made in Simmons' food-stamp application:

| Courtney Smith, PA (10-25-16) | Dr. Snyder (02-21-17) |
|---|---|
| She has been unable to lift, **bend**, sit, or stand for any period of time without pain. (Exhibit 10F, R. 399) | She is unable to lift, sit, or stand for any period of time without being in pain. (Exhibit 15E, R. 224) |

As you can see, the only substantive difference between the two statements is that PA Smith added that Simmons could not bend without pain. Otherwise, it appears that Dr. Snyder copied PA Smith's statement, word for word, when he filled out

Simmons' food-stamp application a few months later.

1. <u>ALJ's treatment of the statement</u>:  In her opinion, the ALJ addressed PA Smith's version of the statement:

> The undersigned affords partial weight to the opinions of the physician's assistant Courtney Smith, PA-C completed in October of 2016 (Exhibit 10F).  Her opinions indicating that the claimant is unable to lift, bend, sit, or stand without pain are not supported by the objective medical findings in the record, including the findings of normal range of motion in the lumbar spine and normal strength in the extremities (Exhibit 8F).

(R. 17). Exhibit 8F, which the ALJ cited as contradicting PA Smith's statement, refers to the report of Dr. Ammar Aldaher, who conducted a consultative examination of Simmons in September 2016—*i.e.*, just one month before PA Smith wrote her statement.  In his report, Dr. Aldaher stated that Simmons suffered "no numbness" and "no muscle weakness" (R. 390-91).  Dr. Aldaher's examination also revealed "no abnormalities" in Simmons' extremities and "no abnormalities" in her range of motion in the lumbosacral area (R. 391).  Accordingly, Dr. Aldaher opined that Simmons "is able to do work related activities such as sitting, standing, walking, lifting, carrying and handling objects" (R. 392).

The ALJ noted that Dr. Aldaher's findings matched a finding from earlier that month, signed by both PA Smith and Dr. Snyder, that Simmons had "5/5" strength in her extremities (R. 17, citing R. 420).  Thus, the ALJ determined that PA Smith's statement in October that Simmons "was unable to lift, bend, sit, or stand without

pain" was contradicted by medical records made by (or at least signed by) Dr. Aldaher, PA Smith, and Dr. Snyder in September (R. 17).

2. <u>Harmless error</u>:  The Commissioner argues that the ALJ's failure to mention and assign weight to the statement that Dr. Snyder made in Simmons' food-stamp application is harmless because the ALJ mentioned and assigned "some weight" to the same statement, as made by PA Smith.  In other words, the court needn't remand this case to find out how much weight the ALJ would assign Dr. Snyder's opinion of Simmons' ability to lift, sit, stand; that information is already in the ALJ's opinion.

Simmons counters with three arguments.  First, Simmons argues that "Dr. Snyder's opinion is worth more than PA-C Smith's simply because Dr. Snyder is a doctor. A physician's assistant is not an 'acceptable medical source,' so a physician's assistant's opinion is not a 'medical opinion'" (doc. 30 at 7).  The court agrees that, unlike a physician assistant's opinion, a treating physician's opinion "must be given substantial or considerable weight," "unless 'good cause' is shown" not to give this weight to the treating physician.  *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)).  The Eleventh Circuit has said that "good cause" to withhold this additional weight exists under three circumstances: (1) the treating physician's opinion was not bolstered by the evidence; (2) record evidence supports a contrary finding, and/or (3) the treating

physician's opinion is either conclusory or inconsistent with his own medical records. *Phillips*, 357 F.3d at 1240-41.

In assigning weight to PA Smith's virtually identical statement, the ALJ found that two of the three "good-cause" factors are present. First, the ALJ found that Dr. Aldaher's examination and opinion contradicts PA Smith's—and thus Dr. Snyder's—opinion (R. 17). *See Phillips*, 357 F.3d at 1240-41 ("good cause" exists where "evidence supported a contrary finding"). Second, the ALJ found that PA Smith and Dr. Snyder's own records of "5/5" muscle strength contradicted PA Smith's—and thus Dr. Snyder's—opinion (R. 17). *See Phillips*, 357 F.3d at 1240-41 ("good cause" exists where "treating physician's opinion was … inconsistent with the doctor's own medical records").

As a result, the ALJ's written opinion already contains "good cause" not to grant Dr. Snyder's statement the enhanced status of "substantial or considerable weight" typically bestowed upon treating physicians. And because the ALJ afforded "some weight" to PA Smith's virtually identical statement (R. 17), there is no likelihood that (a) the ALJ would assign a greater weight to Dr. Snyder due to the prestige of his title and (b) the additional weight would affect the outcome of Simmons' case.

Second, Simmons notes that, in between the time PA Smith wrote the initial statement (*i.e.* October 2016) and Dr. Snyder wrote the same statement in Simmons'

food-stamp application (*i.e.* February 2017), Dr. Snyder received the results of an MRI and the report of neurosurgeon Dr. Clark (doc. 7). Simmons argues that the receipt of this new evidence means Dr. Snyder's identical opinion should be given more weight. This argument fails for two reasons. First, if these records contained an opinion-altering revelation, as Simmons suggests, then surely Dr. Snyder would have mentioned them and/or his opinion would have changed. But it didn't. Dr. Snyder simply copied PA Smith's earlier statement, without any mention of either of these documents. Second—and unlike Dr. Snyder—the ALJ did address these documents in her opinion (R. 14, 17). The ALJ noted that, while the imaging showed degenerative changes to the bilateral knee, "there is no indication that this produces disabling limitations" (R. 17). The ALJ also noted that another MRI was taken nearly a year after Dr. Snyder filled out the food-stamp application, and that MRI "showed normal alignment and no evidence of instability in the lumbar spine" (R. 16, citing Exhibit 15F).

Third, and finally, Simmons argues that adding Dr. Snyder's opinion to PA Smith's opinion bolsters her argument with respect to the "consistency" factor, listed in 20 C.F.R. § 404.1527(c)(4): "Generally, the more consistent a medical opinion is *with the record as a whole*, the more weight we will give to that medical opinion." (doc. 30 at 7). This argument fails for two reasons. First, Simmons misunderstands the consistency factor. When it uses the phrase "with the record as a whole," factor

(c)(4) plainly asks whether one examiner's opinion is consistent with another examiner's opinions and records; not whether one office's records possess internal consistency. Second, if the failure to assign a particular weight to a treating physician's opinion can be harmless error, *see, e.g., Raymond*, 778 Fed. Appx. at 775 (stating that any error in failing to assign weight to a treating physician's opinion was harmless because that opinion did not conflict with other opinions considered by the ALJ); *Romero*, 752 Fed. Appx. at 908 (holding that the failure to give a particular weight to a treating physician's statement was harmless because it was consistent with the ALJ's determination that the claimant could do light work), then the failure to address one of the six factors used to assign weight can also be harmless.

_____

In sum, PA Smith and Dr. Snyder work together; they examined Simmons together; and they expressed the same opinion about Simmons. The ALJ has already addressed that opinion as written by PA Smith, assigned it "some weight," and given specific reasons why it should not be given controlling weight (R. 17). Accordingly, this court deems any error in failing to address Dr. Snyder's statement to be harmless because no "further findings could be made that would alter the ALJ's determination" and thus remanding this case to the ALJ would be a "wasteful corrective exercise." *Ware v. Scheiker*, 651 F.2d 408, 412-13 (5th Cir. Unit A 1981).

**C. The court cannot reweigh the ALJ's credibility determination.**

In the same section of her initial brief (doc. 10, Section 3(A)), Simmons switches back and forth between arguing that the ALJ erred by (a) failing to consider Dr. Snyder's opinion at all and (b) giving more weight to Dr. Aldaher's opinion than Dr. Snyder's opinion.  To the extent that Simmons intended the latter argument (*i.e.* weight/credibility) to be an independent argument, the court can neither "decide the facts anew" nor "reweigh the evidence."  *Winschel*, 631 F.3d at 1178.   Those decisions are left solely to the Commissioner as long as they are supported by substantial evidence—a question the court addresses in Section III. *Id.*

**II.     With the exception of Dr. Snyder's statement, the ALJ conducted a complete assessment of Simmons' application.**

Simmons next argues that, "when the ALJ's reasons for rejecting the severity of a claimant's symptoms are based on an incomplete assessment of the record, her decision is unsupported by substantial evidence" (doc. 10 at 14).  The court generally agrees with that statement, but it does not warrant relief here because—with the exception of Dr. Snyder's statement addressed in Issue I—Simmons fails to cite a particular piece of evidence or testimony that the ALJ failed to consider.

Instead, Simmons offers a handful of instances in which she believes that the ALJ wrongly gave more credibility to one piece of evidence than it gave to another. The court briefly considers each one, with the caveat that the court can neither "decide the facts anew" nor "reweigh the evidence."  *Winschel*, 631 F.3d at 1178.

1. Simmons argues that the ALJ wrongly gave more credibility to an x-ray performed in 2018 than an MRI performed in 2018 when the ALJ made the statement that "imaging showed normal alignment and no evidence of instability in the lumbar spine" (doc. 10 at 15) (referring to R. 16, Exhibit 15F). The court finds that the ALJ considered both pieces of evidence, plus many others, when discussing Simmons' back issues. It is not this court's function to "reweigh the evidence or substitute [its] judgment for that of the [ALJ/Commissioner]." *Winschel*, 631 F.3d at 1178. A reasonable person could have interpreted the evidence as the ALJ did; thus, there is no reversible error.

2. Simmons next argues that the ALJ relied on the wrong evidence when it stated that the claimant was noted to have a "normal gait" (doc. 10 at 15, referring to R. 16, Exhibits 8F, 12F). Simmons argues that other exhibits contained statements that she struggled with her gait, particularly due to her knee issues (doc. 10 at 16, referring to R. 416, 435, 451). Again, this court cannot engage in the reweighing of evidence or substitute its judgment of the best evidence for the ALJ's. The court has reviewed the exhibits Simmons cites, and all others cited by the ALJ in her opinion, and finds that a reasonable person could have interpreted the evidence regarding Simmons' gait as the ALJ did; thus, there is no reversible error.

3. Simmons next argues that the ALJ wrongly mentioned that her pain decreased by 90% after surgery in 2015 because her pain returned as the months and

years passed (doc. 10 at 16, referring to Exhibit 6F).  Simmons is correct; records

indicate that some of her pain returned.  But the ALJ did not limit her review to

records made in 2015; she considered Simmons' records through the hearing in

2018, including the ones mentioned by Simmons as demonstrating her pain (*see* R.

15-17).  Because Simmons fails to cite a particular record that the ALJ ignored, there

is no error.

4. Finally, Simmons refers to the following statement from the ALJ's opinion:

"The undersigned notes that there was an attempt made to update the medical records

but none were available" (R. 16).  Simmons argues that "to the extent that the ALJ

infers that Simmons' pain is not as severe as alleged from the absence of evidence

at a facility where she was not treated, the inference is not supported" (doc. 10 at 17-

18).  The court has reviewed the ALJ's opinion and finds that the ALJ's opinion

does not draw such an inference, nor are any of the ALJ's findings based upon an

alleged failure to update records.  Thus, there is no error.


**III.    The ALJ's finding that Simmons could perform light work, with several exceptions, is supported by substantial evidence.**

Simmons' final argument is that the ALJ failed to adequately explain her

decision that Simmons could perform "light work," despite the effect of Simmons'

obesity on her back and knee pain (doc. 10 at 18-21).

For starters, the ALJ plainly considered Simmons' obesity and its interaction with Simmons' other ailments when determining Simmons' RFC:

> The claimant's obesity, while not stated by any physician to be disabling, was considered in terms of its possible effects on the claimant's ability to work. . . . In the present case, the claimant's obesity is not so severe as to prevent all ambulation, reaching, orthopedic and postural maneuvers. It does, though, in combination with the claimant's spinal stenosis, sciatica, and hypertension, significantly reduce her ability to stand, walk, walk [*sic*], climb, and crawl. A reduction to only light work with further appropriate work restrictions is therefore warranted, and these limitations are accounted for in the residual functional capacity as determined herein.

(R. 17). As shown above, the ALJ took two steps to account for the effect of Simmons' obesity on her other ailments: (1) she lowered Simmons' work level down from "heavy work," as it was at Simmons' last job in 2014,[3] to "light work," and (2) she added the additional restrictions of never climbing ladders (as Simmons had been), not lifting more than 20 pounds occasionally and 10 pounds frequently, and only occasionally stooping, kneeling, crouching, and crawling.

The ALJ supported these limitations with substantial evidence. As the ALJ noted, none of the medical records Simmons presented contained an opinion that her obesity caused her to be disabled or prevented her from doing any type of work (R. 17). To the contrary, Dr. Aldaher found that Simmons had a full range of motion, a

---

[3] Simmons testified that, at her last job, she lifted fabric rolls that weighed up to 100 pounds and used a ladder to put them in bins (R. 39). The regulations would define that as "heavy work," because it involved "lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds." 20 CFR § 404.1567(d).

normal gait, and no muscle weakness, and he opined that Simmons could perform "work related activities such as sitting, standing, walking, lifting, carrying, and handling objects" (R. 392). The ALJ found that opinion to be bolstered by the fact that the recent (2018) x-ray demonstrated no instability of the lumbar spine (R. 16).

In all, the ALJ spent nearly three pages explaining why she was limiting Simmons to "light work" with several additional restrictions based on Simmons' back and knee pain—and the additional pain that obesity might cause her knees and back. The court finds that a reasonable person viewing the same evidence cited by the ALJ could have reached the same conclusion as the ALJ. *See Borges v. Commissioner*, 771 Fed. Appx. 878, 882 (11h Cir. April 26, 2019) (finding that an RFC determination of "light work" with limitations on carrying, sitting, lifting, standing, walking, pulling and pushing for obese claimant was supported by substantial evidence). The court is precluded from taking the next step of re-weighing the evidence to determine whether or not it would have reached the same conclusion as the Commissioner/ALJ. *See id.*

Finally, the court notes that Simmons does not challenge the ALJ's finding in Step 4 that Simmons can still perform her past relevant work as an administrative assistant, order filler, and group-home worker. The court takes Simmons' lack of challenge as additional support for the notion that the ALJ's residual functional capacity finding is supported by the record evidence.

\* \* \*

The court has reviewed the parties' briefs, the ALJ's findings, and the record evidence and finds that the ALJ's decision was supported by substantial evidence. The court finds only one legal error: the failure to consider the statement made by Dr. Snyder in Exhibit 15E. But as explained in Part I, that error is harmless.

It is not, however, the first time the court has seen the same error this year—*i.e.*, an ALJ opinion that addresses all exhibits contained in the "F folder" of exhibits but not the evidence contained in the "E Folder" of exhibits. As explained above, the Court must conduct a harmless-error analysis when this occurs; an analysis that will sometimes lead to costly, avoidable remands. The best way to avoid such remands is to consider *all* exhibits, regardless of their label, during the initial review.

The decision of the SSA Commissioner is due to be **AFFIRMED**. A separate order will be entered.

**DONE** on March 10, 2020.

_____

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE